# EXHIBIT 4

# (ORIGINAL PETITION FOR DECLARATORY JUDGMENT WITH EXHIBIT A)

5/4/2021 2:49 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 53098508
By: Carolina Salgado
Filed: 5/4/2021 2:49 PM

CAUSE NO. _____

| | | |
|---|---|---|
| DAMON CHARGOIS | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| LABATON SUCHAROW, | § | |
| ERIC J. BELFI, | § | |
| AND CHRISTOPHER L. KELLER | § | ____ JUDICIAL DISTRICT |

**ORIGINAL PETITION FOR DECLARATORY JUDGMENT**

DAMON CHARGOIS, Plaintiff herein, files this Original Petition for Declaratory Relief, and in support hereof would respectfully show the Court the following:

**I.  DISCOVERY CONTROL PLAN AND RELIEF SOUGHT**

1. Plaintiff DAMON CHARGOIS intends to conduct discovery under Level 3 of TEX. R. CIV. P. 190.3.

2. Plaintiff DAMON CHARGOIS seeks a declaratory judgment and is not seeking monetary relief in excess of $75,000.00.

**II.  PARTIES AND SERVICE**

3. Plaintiff DAMON CHARGOIS is an attorney licensed and actively practicing law in Houston, Harris County, Texas.

4. Defendant Labaton Sucharow, LLP is a New York based law firm conducting business in Houston, Texas for the purposes of the agreements making the basis of this lawsuit.  As a non-resident defendant, they can be properly served with process through the Texas Secretary of State, Service of Process, P.O. Box 12079, Austin, Texas 78711-2079 and by delivering to Eric J. Belfi of Labaton Sucharow, LLP, 140 Broadway, New York, NY 10005.

5. Defendant Christopher L. Keller, is the Chairman and Head of Executive Committee of Defendant Labaton Sucharow, LLP. As a non-resident defendant, he can be properly served with process through the Texas Secretary of State, Service of Process, P.O. Box 12079, Austin, Texas 78711-2079 and by delivering to Eric J. Belfi of Labaton Sucharow, LLP, 140 Broadway, New York, NY 10005.

6. Defendant Eric J. Belfi, is a partner of Defendant Labaton Sucharow, LLP. As a non-resident defendant, they can be properly served with process through the Texas Secretary of State, Service of Process, P.O. Box 12079, Austin, Texas 78711-2079 and by delivering to Eric J. Belfi of Labaton Sucharow, LLP, 140 Broadway, New York, NY 10005.

### III. JURISDICTION AND VENUE

7. The subject matter in controversy is within the jurisdictional limits of this Court.

8. Pursuant to Tex. Civ. Prac. & Rem. Code §17.042, this Court has jurisdiction over the non-resident Defendants. Defendants purposefully availed themselves of the jurisdiction of the instant court, when they travelled to the state to conduct business with Plaintiff on a continuing basis since 2007. *See Exhibit A, Page 21, and Page 22-25*. Defendants presented the terms of the agreement during trips to the State of Texas and engaged in negotiations of the agreement making the basis of the lawsuit in the State of Texas. *See Id., Page 13 & Page 52*.

9. Venue in this Court is proper pursuant to Tex. Civ. Prac. & Rem. Code § 15.002(a)(1)(4) and §15.006, in as much as the negotiations and initial agreement making the basis of the lawsuit took place in Houston, Harris County, Texas.

## IV. FACTS

10.     On October 2, 2017, Plaintiff Damon Chargois testified at length about the agreement making the basis of this lawsuit. *See Exhibit A.* As he explained, Plaintiff Damon Chargois was contacted by Defendant Eric Belfi in late 2006 to use his local and/or liaison counsel services in securities litigation cases. *See Exhibit A, Page 21.* At the time, the Labaton Defendants were embroiled in securities litigation in Houston, Harris County, involving HCC Holdings. The Labaton Defendants asked Plaintiff Chargois to associated himself with the case:

> "When Eric Belfi came down…He came down to Houston I believe it was for a hearing in the HCC matter. We got to know each other in talking what you do, what do you do, what else do you do, and I told him that we had a Little Rock law firm…We just started talking about what else we did, and he told me that part of his job at Labaton was to—I don't remember the words, but it's along the lines of client development is how I understood it…" *See Exhibit A "Deposition of Damon Chargois", dated October 2, 2017 pg. 21-22.*

11.     As the HCC matter progressed, so too did the relationship between Plaintiff Labaton progressed. Plaintiff attended the mediation and some hearings in the case:

> "THE SPECIAL MASTER: Did you provide office space for the folks – for Labaton folks when they came in?
>
> THE WITNESS: I believe they used my office once, and then we went to court. The other times they flew in, and I either picked 'em up from the

airport and went to court, or I met them in court." *See Exhibit A "Deposition of Damon Chargois", dated October 2, 2017 pg. 25.*

12. After a successful result in the HCC Securities Litigation, due in large part to Chargois' involvement, the Labaton Defendants engaged in healthy discussions/negotiations about continuing their working relationship with the Plaintiff. During that conversation in Houston, the parties came to agreement that for each and every case that Damon Chargois acted as local and/or liaison counsel, then Defendant Labaton would compensate Plaintiff Chargois. The agreed compensation would be twenty percent (20%) of all attorneys' fees recovered for the case. *See Exhibit A, page 50.*

13. The parties' agreement has been honored and should have been abided by Chargois and the Labaton Defendants since 2007. Yet, the Labaton Defendants have made a habit of asking Chargois to take an amount less than 20%. The Labaton Defendants have paid and continue to pay the negotiated amount for each case where Chargois is associated. *See Exhibit A, Pages 70-73, 152.*

14. Plaintiff Chargois gave testimony in a judicial proceeding questioning the legitimacy of attorneys' fees in one the cases that were part of the Chargois & Labaton agreement. *See Exhibit A.* After review, decision, and appeal, the attorneys' fees awarded to Labaton in that case have been finalized. As of March 12, 2021, all parties and counsel are aware that distributions from the settlement proceeds are proper and should occur.

15. With the conclusion of the previous matter, Plaintiff Chargois expected to continue receiving payments from the Chargois & Labaton matters. With neither a cognizable nor legal reason, Labatan Defendants have now asserted that Chargois is no longer entitled to any payments as a result of their long-standing agreement. Accordingly, Plaintiff Damon Chargois now files this

instant suit to ensure payment for his contracted and previously completed work as a local and/or liaison counsel.

## V. DECLARATORY JUDGMENT

16. Incorporating the pertinent testimony found in Exhibit A and the Texas Civil Practices and Remedies Code, Plaintiff Damon Chargois seeks a Declaratory Judgment in this instant case that the Labaton Defendants are estopped from not paying the agreed upon fee for local and/or liaison counsel work. *See* Tex.Civ.Prac.Rem §37.001, et. seq.

17. A declaratory judgment is proper when there is a discernable dispute between the parties and their applicable rights and remedies. *See Bonham State Bank v. Beadle*, 907 S.W. 2d 465, 467 (Tex. 1995). The controversy need not be completely ripe, but rather litigation is imminent and unavoidable. *See Unauthorized Practice of Law Cmte. v. Nationwide Mut. Ins.,* 155 S.W. 3d 590, 595 (Tex.App. – San Antonio 2004, pet. denied.).

18. The Court is right and just to considered two elements (1) the fitness of the issues for judicial review; and (2) the hardship occasioned to a party by the Court's denying judicial review. *See Juliff Gardens, L.L.C. v. Texas Comm'n on Envtl. Quality*, 131 S.W.3d 271, 277 (Tex. App. – Austin 2004, no pet.)

19. In this case, Plaintiff Chargois has received no communication from the Labaton Defendants ending their long-standing agreement. There is no indication that the Labaton Defendants have fully completed their obligations under the terms of their agreements. In the absence of proper notice, proper accounting and proper payments, Plaintiff Chargois is entitled to declaratory relief. Plaintiff Chargois, who is at a great disadvantage in his own pursuits to protect his right under the Chargois & Labaton Agreement, seeks this Court's assistance in ensuring the contract obligations are met.

## VI. ATTORNEYS' FEES

20. As this is a suit for declaratory relief, Plaintiff Damon Chargois is entitled to recover reasonable and necessary attorneys' fees. See Tex. Civ. Prac. & Rem. Code §37.009.

## VII.  PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendants be cited to appear and answer herein, and that on final trial hereof declaratory judgment be granted as requested herein and Plaintiffs be awarded costs and reasonable and necessary attorney's fees, and for such other and further relief that may be awarded at law or in equity.

**SORRELS LAW**

*/s/ Randall O. Sorrels*
Randall O. Sorrels
State Bar No. 10000000
Alexandra Farias-Sorrels
State Bar No. 24074197
5300 Memorial Dr., Suite 270
Houston, Texas 77007
Tel: (713) 496-1100
Fax: (713) 238-9500
randy@sorrelslaw.com
alex@sorrelslaw.com

## Murray Fogler

**From:** Angie House <angie@sorrelslaw.com>
**Sent:** Monday, July 12, 2021 4:47 PM
**To:** Murray Fogler
**Subject:** RE: Chargois v. Labaton Sucharow
**Attachments:** Ex. A.pdf

Here's the Exhibit A

**Angie House**
Senior Professional Assistant



5300 Memorial Dr., Suite 270 | Houston, TX 77007
Main: 713-496-1100 | Direct: 713-226-5156| Cell: 713-569-2523
Angie@SorrelsLaw.com

This email is intended as a private communication with the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message.

**From:** Murray Fogler <mfogler@foglerbrar.com>
**Sent:** Tuesday, July 6, 2021 10:22 AM
**To:** Angie House <angie@sorrelslaw.com>; Randall Sorrels <Randy@sorrelslaw.com>; Alexandra Farias-Sorrels <alex@sorrelslaw.com>
**Subject:** RE: Chargois v. Labaton Sucharow

Angie,

When you have a moment, could you send me a copy of the exhibit that is referenced in the petition?

Thank you,
Murray

**REDACTED**

**Damon Chargois**

1

Volume: 1

Pages: 1-330

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

---

In Re: STATE STREET ATTORNEYS FEES

---

BEFORE: Special Master Honorable Gerald Rosen,
United States District Court, Retired

DEPOSITION of DAMON J. CHARGOIS

October 2, 2017, 9:16 a.m.-5:01 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter: Paulette Cook, RPR/RMR

**Page 18**

1  A. I believe so in that case, yeah.
2  Q. All right. So describe what the HCC
3  Holdings case was about and what you did on behalf
4  of Labaton.
5  A. It was a securities fraud type of case on
6  the civil side. Don't know much more substance than
7  that.
8      And what I did was appear at one or two
9  hearings with them. I believe -- I believe on that
10 case I sponsored at least one of their lawyers to
11 appear in court.
12 Q. Pro hac vice?
13 A. Sorry. Pro hac vice.
14 Q. Okay.
15 A. And at the appropriate time I believe I
16 attended the mediation. I may be missing a couple
17 of things but nothing of substance on the case.
18 Q. Okay. And was the case resolved at some
19 point?
20 A. Yes, sir.
21 Q. And how was it resolved?
22 A. Settlement.
23 Q. And what was your participation in that?
24     Did you have a role in that, or was that

**Page 19**

1  handled by Labaton's attorneys?
2  A. It was handled by Labaton attorneys.
3  Q. And did you assist in some fashion?
4  A. No.
5  Q. Okay. So it was handled exclusively by
6  Labaton?
7  A. Yes, sir.
8  Q. All right. And in the course of working on
9  behalf of Labaton in the HCC Holdings case, in
10 addition to Eric Belfi, did you meet any other
11 attorneys?
12 A. Yes, sir.
13 Q. Who did you meet?
14 A. Chris Keller.
15 Q. All right. And when did you meet Chris
16 Keller? At what stage in the proceedings?
17 A. I met him first -- I was -- I believe the
18 order of it is I met him either as we were
19 discussing serving as local counsel somewhere around
20 that time early on, but I believe I first met him
21 when he and Eric Belfi came down, and I went up, and
22 we met in Arkansas.
23 Q. Okay. So your recollection is that you met
24 Belfi and Keller together in Little Rock?

**Page 20**

1  A. Yes, sir.
2  Q. And when you met them in Little Rock, what
3  did they ask you to do?
4  A. They were interested in having a connection
5  to Arkansas and to Little Rock and making inroads,
6  and they asked me to help them make introductions.
7  Q. Okay. And when you say they asked you to
8  make introductions, what type of persons did they
9  want to meet?
10 A. Eric explained to me that he -- part of his
11 job at Labaton was networking and client development
12 or cultivation -- I don't remember the word but
13 something along those lines, and that they did not
14 have a presence in Little Rock and that we did and
15 that if we could help introduce them to
16 institutional investors or folks that could help
17 them get introductions to institutional investors.
18 Q. And what was the basis of your knowledge of
19 institutional investors?
20 A. I had none.
21     THE SPECIAL MASTER: Again, if you could
22 just give us a timeframe.
23     THE WITNESS: Around the same timeframe.
24 Early 2007.

**Page 21**

1      THE SPECIAL MASTER: Same timeframe as
2  the HCC case?
3      THE WITNESS: Yes, sir.
4      THE SPECIAL MASTER: Was the case still
5  ongoing? Had it mediated yet?
6      THE WITNESS: No, sir.
7      THE SPECIAL MASTER: So this was almost
8  at the outset of the relationship in the HCC case?
9      THE WITNESS: Almost, yes.
10     BY MR. SINNOTT:
11 Q. Why do you think Labaton asked you to help
12 them meet institutional investors when you didn't
13 have any history in that world?
14 A. When Eric Belfi came down -- this is prior
15 to Little Rock. He came down to Houston I believe
16 it was for a hearing in the HCC matter. We got to
17 know each other in talking what do you do, what do
18 you do, what else do you do, and I told him that we
19 had a Little Rock law firm --
20     MR. McTIGUE: If you want to listen, you
21 can do this. We got this --
22     MR. SINNOTT: We can hear you.
23     THE SPECIAL MASTER: Brian?
24     MR. McTIGUE: Excuse me.

### Page 22

1     MR. SINNOTT: Thank you.
2     BY MR. SINNOTT:
3 Q. I'm sorry.
4 A. Sure.
5 Q. Eric had come down to Houston.
6 A. Right.
7 Q. And what did he say to you?
8 A. We just started talking about what else we
9 did, and he told me that part of his job at Labaton
10 was to -- I don't remember the words, but it's along
11 the lines of client development is how I understood
12 it.
13     (Interruption.)
14     MR. KELLY: Pardon me. She's alerting
15 me someone's trying to dial in.
16     MR. SINNOTT: Has someone else joined
17 the call-in line?
18     THE SPECIAL MASTER: Do you know who it
19 is?
20     UNIDENTIFIED SPEAKER: No, but I could
21 find out.
22     MR. SINNOTT: If anyone else joins the
23 phone line, please identify yourself, but we're
24 waiting for another party to call in.

### Page 23

1     MS. LUKEY: You may have to set up
2 somebody's iPhone on speaker.
3     THE REPORTER: I'm going to go off the
4 record then.
5     (Off the record.)
6     MR. SINNOTT: Michael, welcome to the
7 call. Probably a little bit more complicated than
8 you thought it would be.
9     MR. SMITH: It's fine.
10     MR. SINNOTT: All right, Michael.
11 Thanks. We'll proceed. Can everyone else hear us?
12     COUNSEL ON TELECONFERENCE: Yes.
13     MR. SINNOTT: I wanted to make sure we
14 hadn't gone mute there.
15     TELECON VOICE MESSAGE: The following
16 participant has entered the conference.
17     MR. SINNOTT: Is someone else on the
18 line?
19     MR. VALLEE: Sorry, Bill. I dropped off
20 by accident.
21     MR. SINNOTT: Okay. Jim.
22     MR. VALLEE: Apologize.
23     MR. SINNOTT: We're all set. Thanks.
24     BY MR. SINNOTT:

### Page 24

1 Q. So when we left off, Damon, Judge Rosen and
2 I had asked you about your meetings with -- how you
3 came to know Eric Belfi and Chris Keller.
4     You had been approached by Eric Belfi in
5 Houston as part of Labaton's desire to hire local
6 counsel for the HCC Holdings case. And at some
7 point in time in Little Rock you met Christopher
8 Keller along with Eric Belfi. They came down there
9 together.
10     So in addition to looking for local
11 counsel in HCC Holdings as I understand it -- and
12 please correct me if I'm wrong -- they were hoping
13 you could make some inroads, some client
14 development, as you described it, with institutional
15 investors. Is that an accurate summary?
16 A. Yes.
17     MR. MARX: Just to be clear, Bill, I
18 think he said he was serving as local counsel in HCC
19 Holdings --
20     THE SPECIAL MASTER: Yeah --
21     MR. MARX: -- at the time of the
22 introduction.
23     THE SPECIAL MASTER: -- and that was in
24 Houston.

### Page 25

1     THE WITNESS: Yes, sir.
2     THE SPECIAL MASTER: Was HCC an MDL?
3     THE WITNESS: No, sir.
4     THE SPECIAL MASTER: No?
5     THE WITNESS: Wait a second. I don't
6 think it was.
7     BY MR. SINNOTT:
8 Q. But your testimony was you had very little
9 participation in that case other than sponsoring
10 someone pro hac vice and --
11 A. I attended the mediation.
12 Q. You attended the mediation. Okay.
13     MR. MARX: And appeared in court?
14     THE WITNESS: And I appeared in court.
15     THE SPECIAL MASTER: Did you provide
16 office space for the folks -- for Labaton folks when
17 they came in?
18     THE WITNESS: I believe they used my
19 office once, and then we went to court.
20     The other times they flew in, and I
21 either picked 'em up from the airport and went to
22 court, or I met them in court.
23     BY MR. SINNOTT:
24 Q. Now in addition to Mr. -- Attorney Belfi and

Page 50

1  or institutional investors as I am able to.
2  Q. Okay. And who were some of those other
3     folks that you introduced them to, Damon?
4  A. Over the years, Texas Teachers Pension Fund,
5     Houston Municipal Employees Pension Fund, the
6     Houston Firefighters -- I don't think he was on the
7     board, but he was prominent within Houston
8     Firefighters, a gentleman.
9        And as far as institutional investors
10    go, that's it.
11 Q. Okay. As a result of your having made this
12    introduction of Labaton to Arkansas Teachers, did
13    you come to an agreement or a contract or something
14    formal or informal with respect to your ongoing
15    relationship with Labaton?
16 A. Yes, sir.
17 Q. Could you tell us about that?
18 A. Sure. If the -- the agreement as they
19    presented it to me was if ultimately they are
20    selected to represent any institutional investor
21    that I facilitated an introduction to, if they are
22    successful in obtaining a recovery, they would split
23    their attorneys' fees with my firm 80 percent/20
24    percent.

Page 51

1  Q. So you would receive 20 percent of the
2     attorneys' fees?
3  A. Yes, sir.
4  Q. And they would receive 80 percent?
5  A. Yes, sir.
6     THE SPECIAL MASTER: Was that in all
7     cases in which they would be counsel to a party that
8     you had helped to facilitate the relationship with?
9     THE WITNESS: Yes, sir.
10    THE SPECIAL MASTER: Not limited to
11    Arkansas?
12    THE WITNESS: Correct.
13    THE SPECIAL MASTER: And when did you
14    begin having these discussions? This will be a
15    compound question, but you can break it down.
16    THE WITNESS: Sure.
17    THE SPECIAL MASTER: Were the
18    discussions with Eric Belfi or Chris Keller or both?
19    THE WITNESS: Good question.
20    When Eric Belfi and Chris Keller came
21    down to Little Rock that first time that we'd
22    already talked about --
23    THE SPECIAL MASTER: To meet with
24    Senator Farris?

Page 52

1     THE WITNESS: No. I believe that was
2     another occasion.
3     THE SPECIAL MASTER: Okay.
4     THE WITNESS: When they came to Little
5     Rock to meet with myself, and I believe Tim was
6     there as well --
7     THE SPECIAL MASTER: Oh, okay.
8     THE WITNESS: -- in our offices, they
9     said here's what we're interested in. We would like
10    to have a presence in Little Rock. We don't have
11    one currently.
12       We'd like a presence in Houston because
13    we don't have one currently. We like to work with
14    local counsel. You're local counsel.
15       And they presented the arrangements I
16    just told you about.
17    THE SPECIAL MASTER: So this was almost
18    at the outset of the relationship then?
19    THE WITNESS: Yes, sir.
20    THE SPECIAL MASTER: And you began
21    talking with any level of specificity about how the
22    relationship would be managed and compensation for
23    the relationship for you?
24    THE WITNESS: Yes, sir.

Page 53

1     THE SPECIAL MASTER: Okay.
2     MR. MARX: I think the record's clear
3     now based on the followup questions, but your
4     question earlier, Bill, was as a result of this RFP
5     process and Little Rock what was the nature of the
6     agreement between Damon's firm and Labaton.
7        I think it's clear now that that was an
8     initial conversation about an overarching agreement
9     which included --
10    THE SPECIAL MASTER: Correct me if I'm
11    wrong. I don't want to misstate it, but it sounds
12    like the commercial piece of the relationship
13    between you and Labaton actually began almost at the
14    outset of the relationship that there was some
15    understanding about how you would be compensated --
16    I say "you," I mean your firm.
17    THE WITNESS: That's correct.
18    BY MR. SINNOTT:
19 Q. And with respect to Arkansas Teachers,
20    Damon, how many other cases resulted from that
21    introduction that you had made of Labaton to
22    Arkansas?
23    And when I say Arkansas, I'm using that
24    as shorthand for Arkansas Teachers.

**Page 70**

1 facilitated?
2    THE WITNESS: Yes, sir.
3    THE SPECIAL MASTER: But no separate
4 additional facilitation in this case, correct?
5    THE WITNESS: That's correct.
6    BY MR. SINNOTT:
7 Q. How about the K12 case?
8    MS. LUKEY: I'm sorry?
9    MR. SINNOTT: K12.
10    THE SPECIAL MASTER: K12.
11    MS. LUKEY: Thank you.
12 A. K12 was an Arkansas Teachers case.
13 It's going back a little bit, but I
14 believe -- don't hold me to it, but I believe the
15 attorneys fee that Labaton collected in that case
16 was just shy of two million dollars, and our -- my
17 firm's payment was around -- between 150 and
18 $200,000. That was the negotiated figure.
19 Q. Spectrum Pharmaceuticals?
20 A. Yes, sir.
21 Q. Was that an Arkansas case?
22 A. Yes, sir.
23 Q. And tell us about that.
24 A. Well, Spectrum and another one called Vocera

**Page 71**

1 resolved around the same time. And, um, I belive --
2 so I've always viewed them together. I believe --
3    THE SPECIAL MASTER: Were they both
4 Arkansas cases?
5    THE WITNESS: Yes, sir.
6 A. I believe the overall attorneys' fee for
7 Labaton was around 4-and-a-half million dollars,
8 maybe 4 -- 4-and-a-half million dollars, and my
9 firm's negotiated fee was $105,000 for one and
10 $240,000, give or take, for the other.
11 Q. Okay. How about in re A10 Networks
12 shareholder litigation? Does that sound familiar?
13 A. No, sir.
14 Q. Okay. And you said earlier that you had a
15 role or received payment for the Netflix case?
16 A. That was dismissed.
17 Q. It was dismissed. So you didn't get
18 anything out of that?
19 A. No, sir.
20 Q. And Labaton didn't get anything out of that?
21 A. Not that I know of.
22 Q. How about the BP Oil matter?
23 A. Yes, sir.
24 Q. Did you receive any payments from that case?

**Page 72**

1 A. No, sir.
2 Q. Were you approached on that case?
3 A. Was I approached?
4 Q. By anyone looking for introductions.
5 A. No, sir.
6 Q. All right. So Garrett Bradley didn't
7 approach you?
8 A. I guess I'm confused by "approach." I'm
9 local counsel in that case.
10 Q. Oh, you are local counsel.
11 A. Yes, sir.
12 Q. Please tell us about that.
13 A. Labaton had a desire to pursue an individual
14 action against BP with Arkansas Teachers as a
15 client, and they asked me would I -- and they wanted
16 to file it in Houston.
17 That's where a lot of the BP matters --
18 Houston and New Orleans -- were being litigated.
19 And they asked me to serve as local counsel in that
20 matter.
21 Q. Was that resolved?
22 A. No, sir.
23 Q. It's ongoing?
24 A. Yes, sir.

**Page 73**

1 Q. And is that the ongoing case that you
2 referred to earlier in your testimony?
3 A. It is.
4 Q. That's it?
5 A. (Nods head.)
6    THE SPECIAL MASTER: So you actually
7 filed an appearance in that case in Houston?
8    THE WITNESS: Yes, sir.
9    THE SPECIAL MASTER: Are you performing
10 work in the case?
11    THE WITNESS: I've attended two hearings
12 and filed a matter under seal where we walk it to
13 the courthouse in a sealed envelope and do that.
14 Other that, no.
15    THE SPECIAL MASTER: Depositions,
16 discovery work, anything?
17    THE WITNESS: No depositions. No
18 discovery work.
19    THE SPECIAL MASTER: Is the case in
20 mediation?
21    THE WITNESS: No, sir.
22    BY MR. SINNOTT:
23 Q. When did you learn about the State Street
24 case?

**Page 150**

1 that Chris is working on an agreement in writing.
2 So I am including him on this e-mail. I don't know
3 how formal you guys want to be on this, but you
4 probably notice that I am pretty informal and rely
5 more on our mutual trust and respect with each other
6 to carry the day. That said, I think it's important
7 for us to lay out our understanding of our agreement
8 with respect to the gathering of pension fund
9 business.
10    We have agreed that Chargois & Herron,
11 LLP shall receive 20 percent of the gross attorney
12 fees recovered by Labaton Sucharow on any litigation
13 or claims process brought on behalf of the Arkansas
14 Teacher Retirement Pension Fund. We have also
15 agreed to the same payment terms shall apply to any
16 other pension fund or retirement fund representation
17 that Labaton Sucharow obtains via contacts through
18 Chargois & Herron.
19    This includes introductions to funds in
20 Atlanta, Richmond and Georgia via Frank Stout in
21 addition to Chargois & Herron, LLP and CMH's
22 contacts. Eric, much earlier you and I had agreed
23 that CMH would receive 10 percent of gross attorney
24 fees received by Labaton for any pension fund

**Page 151**

1 business that came by way of contacts through Bailey
2 Bailey & Perrin.
3    While I initially put you guys together
4 in addition to getting us an audience with Papa
5 Bailey, I haven't kept up what you were doing with
6 that firm. My experience with that firm is that
7 they would like to make and keep as much of the fees
8 generated through their contacts as possible.
9 Please advise me on whether our deal with you is
10 creating an issue."
11    So I'd like to ask you first, Damon,
12 what prompted you to -- you know, albeit in e-mail
13 form -- to try to formalize the agreement that you
14 had with Labaton?
15 A. By February of 2009 basically two years had
16 passed, and we had no real anything, except for
17 e-mails back and forth.
18    And I am very easygoing about that, but
19 it had become I guess enough of an issue for me to
20 want to at least get an e-mail confirming what we
21 agreed to.
22 Q. Okay. And who is Frank Stout?
23 A. Frank Stout was Tim Herron's son-in-law in
24 Georgia.

**Page 152**

1 Q. Okay. I've seen his name in several spots
2 and just couldn't quite figure out who he was. All
3 right. Thank you.
4    And if you'd take a look at a document
5 dated February 12, 2009 which is the following day
6 at 9:56 p.m., and this is LBS 030992. It's a
7 one-page document.
8    And Eric writes to Christopher with the
9 subject again being you, Damon, and says, "I spoke
10 to Damon, and we are on the same page as making
11 adjustments, if necessary."
12    So was there a followup telephone call
13 after you had sent the e-mail that we just reviewed
14 on February 11th?
15 A. I believe so.
16 Q. All right. Do you remember the discussion
17 that you had with Eric during that conversation?
18 A. Vaguely.
19 Q. All right. What were the adjustments that
20 you talked about making?
21 A. I believe he mentioned that as things happen
22 going forward he may have to ask me to take less.
23 Q. Okay. And a short time later that evening
24 at 10:40 p.m. also on February 12th -- and this is

**Page 153**

1 designated LBS 040124 and 125 -- there's an
2 exchange, and, in fact, if you look at the bottom of
3 the first page, Eric at 4:57 p.m. late in the
4 afternoon says, "I spoke to Damon. We're on the
5 same page." Which we just covered.
6    And then Mr. Keller responds
7 approximately 15 minutes later to Eric and to Larry
8 Sucharow, okay, just so you know, blank is standing
9 in the way of our making a deal in blank which would
10 have made it incrementally more likely that we get
11 the case and blank a role in it. Blank said no to
12 the deal we are told despite the support of blank
13 now has no shot. A great job he is doing for the
14 client.
15    Any idea who Mr. Keller's referring to
16 here as far as standing in the way of a deal?
17 A. No, sir.
18 Q. It's not you, is it?
19 A. I don't think so.
20    MS. LUKEY: For the record, although we
21 didn't make the redactions, it's our understanding
22 nothing was intentionally redacted that relates
23 either to Mr. Chargois or to Arkansas.
24    So the redactions are to some unrelated